IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| BONITA A. GARRETT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 09-0019-CV-W-ODS |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## ORDER AND OPINION (1) REVERSING COMMISSIONER'S FINAL DECISION DENYING BENEFITS AND (2) REMANDING FOR A CALCULATION AND AWARD OF BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying her applications for disability and supplemental security income benefits. The Commissioner's decision is reversed, and the case is remanded with instructions that the Commissioner calculate and award benefits.

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

I.

First, substantial evidence in the Record demonstrates Plaintiff meets a listed impairment. Listing 11.02 (under the heading of neurological impairments) provides that a claimant is disabled if she suffers from major motor seizures more frequently than once a month. Such seizures are to consist of either "loss of consciousness and convulsive seizures" or "[n]octurnal episodes manifesting residuals which interfere significantly with activity during the day." Listion 11.03 provides a claimant is disabled if she suffers from minor seizures more frequently than once per week. These seizures are to be accompanied by "alteration of awareness or loss of consciousness and . . . manifestations of unconventional behavior or significant interference with activity during the day."

The ALJ found – based on the opinion of a medical expert (Dr. Joseph Rubini) – that while Plaintiff suffers from a "seizure disorder/epilepsy," she "does not meet the seizure listings . . . because the frequency of seizures required by the listings is not documented in the medical records." R. at 25. The Record demonstrates otherwise. Plaintiff's treating doctor for many years was Dr. Alicia Albers at the University of Kansas Medical Center. In February 2001, Dr. Albers wrote a letter indicating she had been treating Plaintiff for "almost one year" and had diagnosed her as suffering from a seizure disorder. R. at 327. This letter was prepared for Plaintiff's employer (Wal-Mart) because Plaintiff was having seizures at work. R. at 641-42.[1] In June 2002, a record from KU Med Center indicates Plaintiff was experiencing three or four seizures per month. During these seizures Plaintiff was both "passing out" and convulsing. R. at 178. A record from KU Med Center dated July 18, 2002, indicates Plaintiff "has intractable epilepsy and has a minimum of 2-3 seizures per week." R. at 493. In early August 2002, KU Med Center indicated Plaintiff was experiencing more seizures than usual. R. at 182. In late August, KU Med Center reported Plaintiff was experiencing

---

[1]Apparently, Wal-Mart was calling for an ambulance every time Plaintiff had a seizure. Dr. Albers' letter provided guidance as to when an ambulance was necessary.

2

one to two seizures per week, marked by both a loss of consciousness and convulsions. R. at 184. Similar reports were made in November 2002. R. at 185, 187.

On May 19, 2003, a doctor at KU Med Center's Epilepsy Center (Dr. Ivan Osorio) admitted Plaintiff so she could undergo a video monitored EEG. R. at 197-99. For purposes of the test, Plaintiff was removed from all medication. She was discharged on May 25. In the history portion of the report from this visit, it is documented that Plaintiff "has spell[s] of staring and losing conciousness which started 1-1/2 years ago. During this spell she becomes [sic] staring and upper and lower extremities start to shake, sometimes she loses concousiness and goes to the ground, shaking." Plaintiff would be confused for up to an hour following these episodes. The "spells come in clusters every one to two months and within a few days she may have five to six spells."

Seizure activity was noted during the test, but "[a] review of her recorded spells has not [been] completed yet and the patient was discharged home." A diagnosis of "seizure, unclassified" was recorded, but in light of the previous quote this appears to be an interim diagnosis at best.[2] Plaintiff was directed to return in four weeks. Unfortunately, Wal-Mart fired her, causing Plaintiff to lose the insurance coverage she needed to go to KU Med Center – so it was some time before Plaintiff was able to return.[3] In the meantime, on September 11, 2003, Plaintiff went to Truman Medical Center. The doctor initially indicated "there may be at least a component of pseudoseizures as well as true seizures and indicated her plan to obtain records from KU Med Center. R. at 202-03. However, at no time was Plaintiff formally diagnosed as suffering from pseudoseizures.[4]

---

[2]Thus, the ALJ's reliance on this statement to undercut the doctor's opinion is misplaced. R. at 30, 32.

[3]This explanation for the delay ameliorates the ALJ's concerns. R. at 28.

[4]According to a website maintained by the University of Michigan, "[p]seudoseizures resemble epileptic seizures. Patients experience episodes of loss of consciousness, twitching or jerking, and unusual emotional states, such as intense feelings of fear or deja vu. The episodes may last 20 minutes, but are not associated with electrical abnormalities in the brain as is the case with epileptic seizures. . . . [P]seudoseizures are psychological defense mechanisms induced by stress or episodes

3

Plaintiff returned to KU Med Center in December 2003 for treatment for her seizures.[5]  R. at 249.  Based on her statements regarding her seizures, the tests performed in May 2003, and the records of her prior visits and treatments, Plaintiff was prescribed Keppra in addition to the Dilantin she had been taking.  R. at 251.  She followed up in January 2004, reporting that she suffered from six seizures every two weeks during which she would black out and fall, although no convulsions were observed by others.  She also reported two to three episodes during which she would lose awareness, but not consciousness.  R. at 253.  At this time Plaintiff was taking 460 mg of Dilantin and 1250 mg of Keppra daily.  R. at 260.

In March 2003, Plaintiff continued receiving treatment from Kansas University Physicians, Inc., an entity related in some way to KU Med Center.  R. at 265.  She returned in April 2004, and at that time was told to return in four months.  R. at 267-69.  She returned in August 2004 and was instructed to return in two months.  R. at 270-72.  Her next appointment was in October 2004.  R. at 273-75.  After that, her next visit was in April 2005; the treatment record indicates this visit was for a six month follow-up from her preceding visit in October.  R. at 276-78.  During all of these visits Plaintiff's description of the frequency and nature of her seizures was consistent with her prior descriptions.

Dr. Osorio completed a Residual Functional Capacity Questionnaire in 2007, indicating Plaintiff suffered from "partial complex seizures with secondary generalization" that occurred two to ten times per month.  He described the condition as "intractable despite trials on multiple meds" and that Plaintiff had been compliant with the medication.  R. at 470-74.  The ALJ discounted Dr. Osorio's opinion for a variety of reasons.  First, it indicated Plaintiff's last three seizures where in late January and early

---

of severe emotional trauma."
http://www.med.umich.edu/opm/newspage/2003/pseudoseizures.htm (last visited February 18, 2010).

[5]The Record does not indicate how Plaintiff was able to afford this treatment.  It may be that Plaintiff became covered under her husband's health insurance (although she was not covered at the time of the March 6, 2007, hearing.  R. at 692.).

February 2007, but that information is clearly not in Dr. Osorio's handwriting. While it is troublesome that aspects of the RFC Questionnaire were not completed by Dr. Osorio, that fact should not detract from his opinion. Second, the ALJ contend Dr. Osorio's diagnosis conflicts with his prior statement that Plaintiff had a "seizure disorder, unclassified," but as noted earlier this was just an interim diagnosis pending analysis of the video EEG. Third, Dr. Osorio indicates Plaintiff's seizures are "likely to disrupt the work of co-workers," will need more supervision, and may have to leave or take unscheduled breaks. The ALJ found this inconsistent with the evidence that Plaintiff worked at Wal-Mart – however, there is no conflict because Plaintiff's description of her work at Wal-Mart demonstrated that her seizures disrupted the workplace, limited the jobs she could perform, and required unscheduled breaks and absences. Finally, the ALJ noted that tests performed on some of Plaintiff's visits demonstrated her Dilantin levels were low.[6] On many of those occasions, Plaintiff was at the doctor's office to refill her Dilantin, indicating that she had used her prescription and perhaps had missed a dosage or two before getting the necessary appointment. Significantly, the treatment notes from KU Med Center do not express any concerns about Plaintiff's medication practices, and there is little justification for rejecting Dr. Osorio's assessment.

Finally, the ALJ noted Plaintiff failed to maintain a diary of her seizures. While the medical expert testified this was the typical way to evaluate the frequency of a patient's seizures, there is no indication that it is mandatory. Plaintiff's treating physicians documented her seizure activity and there is no basis for concluding the physicians were incorrect or should not have reached the conclusions they expressed.

Having reviewed the medical record, the Court now turns to Plaintiff's testimony. During the first hearing (in August 2005), Plaintiff testified she had two types of seizures: "blackout seizures" during which she remained conscious but was unresponsive and unaware of her surroundings, and more serious seizures during which she would convulse and lose consciousness. R. at 642. The convulsive seizures

---

[6]The ALJ actually described the levels as "subtherapeutic," but the Record only indicates the levels were "low" and does not indicate whether "low" is the same as "subtherapeutic."

increased over time; when she started at Wal-Mart they occurred four to five times in a two month period, by the time she was fired they were occurring four to five times per month, and at the time of the hearing they were occurring three to four times per week. R. at 643.  The blackout seizures were occurring frequently, although it is hard for Plaintiff to know for certain because she has to rely on other people to tell her when they occur.  R. at 646-47.  During the March 2007 hearing, Plaintiff testified in essentially the same manner.  R. at 694; see also R. at 712-14 (testimony of Plaintiff's husband).

The Record conclusively establishes Plaintiff meets or equal the listings, and is thus presumptively disabled.  That being the case, there is no need to consider Plaintiff's residual functional capacity.

## II.

Even if Plaintiff's condition does not meet or equal a listed impairment, the Record establishes she is disabled because her residual functional capacity leaves her incapable of working in the national economy.  In reaching a contrary conclusion, the ALJ relied on the factors identified above to reject the opinions of her treating doctors and Plaintiff's testimony.

> The Commissioner defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions.  A treating physician's opinion is due controlling weight if that opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

Ellis v. Barnhart, 392 F.3d 988, 995 (8th Cir. 2005) (quotations omitted).  For the reasons discussed above, the Record does not provide a basis for rejecting the opinions and findings of Plaintiff's treating physicians.

Similarly, there is no basis for discounting Plaintiff's testimony.   The ALJ is required to consider, among other factors, the claimant's daily activities, the duration,

6

frequency and intensity of the symptoms, and functional restrictions. Plaintiff testified ordinary tasks are interrupted by her blackout seizures. R. at 651-52, 701. She has difficulty concentrating and is forgetful. R. at 652-53, 701, 714-16. Her family and friends insure she is no longer left alone because of her seizures. R. at 700-01. The ALJ found it significant that Plaintiff worked at Wal-Mart until May 2003, but failed to account for the fact that Wal-Mart fired her because of her seizures. The ALJ also found it significant that Plaintiff had physical custody of her grandchildren until November 2004. Without further detail, however, it is hard to see how this can have any great impact on the analysis. First and foremost, nothing in the Record indicates Plaintiff was wholly responsible for caring for the children. When asked whether she was watching the grandchildren or if they were watching her, Plaintiff testified "I think it was a mutual thing with my granddaughter but I also had, you know, company was there part of the time and I had neighbors across the street and next door." R. at 705. Moreover, the circumstances of her custody and the later removal of the children are not clear. For instance it may be that Plaintiff took custody of her grandchildren to keep them out of the foster care system, knowing that her husband and friends would be able to help shoulder the burden. It also may be that the grandchildren were taken from her custody precisely because of her seizures. R. at 719. Ultimately, the fact Plaintiff had custody of her grandchildren, alone, is not substantial evidence permitting the ALJ to discount Plaintiff's credibility.

The limitations described by Plaintiff and her doctors were incorporated into hypothetical questions posed to a vocational expert ("VE"). The VE testified that a person who experienced seizures that incapacitated them for two hours at a time three times a week would be unable to perform work. She also testified that a person who "had problems staying on task whether it was because of the seizure or inability to concentrate for up to a third of the day" would not be able to maintain employment. R. at 724. Based on the Record, these hypothetical questions incorporate conservative descriptions of Plaintiff's residual functional capacity. In light of the VE's testimony, Plaintiff cannot perform work in the national economy.

7

<u>III.</u>

For the foregoing reasons, the Court concludes the Commissioner's final decision is not supported by substantial evidence in the Record as a whole. To the contrary, the Record conclusively establishes Plaintiff meets or equals a listed impairment, and she is presumed disabled on that basis. Alternatively, even if Plaintiff is not determined to be disabled at this stage of the analysis, the Record establishes her residual functional capacity is limited such that she cannot perform work in the national economy. The Commissioner's final decision is reversed, and the matter is remanded for a calculation and award of benefits.

IT IS SO ORDERED.

DATE: February 23, 2010

/s/ <u>Ortrie D. Smith</u>
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT